# ATTACHMENT 16

AMERICAN ARBITRATION ASSOCIATION

PACIFIC DEVELOPMENT PARTNERS X,
LLC and PACIFIC TRIBAL PARTNERS, LLC,

    Claimants,

v.

ELEM COLONY OF POMO INDIANS OF THE
SULPHUR BANK RANCHERIA,

    Respondent.

No. 74-181-Y-01184-08

## CLAIMANTS' PRE-HEARING BRIEF

Pursuant to the Arbitrator's Scheduling Order dated July 23, 2009, as extended via e-mail on August, 17, 2009, Claimants Pacific Development Partners X, LLC ("PDPX") and Pacific Tribal Partners, LLC ("PTP") respectfully submit this pre-hearing brief outlining the basis of their claims against Respondent Elem Colony of Pomo Indians (the "Tribe") and demonstrating that the Tribe's purported defenses are baseless.

### SUMMARY OF RELEVANT FACTS

Relevant facts are set forth in some detail in the accompanying Declarations that were filed earlier this year in the District Court case that culminated in an Order compelling arbitration of this matter. These Declarations include: (1) the Declaration of Daniel J. Kerrigan, Jr. ("Kerrigan Decl."), the principal of PTP and PDPX; (2) the Declaration of Raymond Brown, Sr. ("Brown Decl."), the former Chairman of the Tribe whose tenure encompassed the period relevant to this proceeding; and (3) the Declaration of James O'Reilly ("O'Reilly Decl."), a

minority stakeholder in PTP and PDPX who was involved contract negotiations at issue presently. Also accompanying this brief are two Declarations filed on behalf of the Tribe in the aforementioned District Court case: the Declaration of Geraldine Johnson ("Johnson Decl."), the current Chairperson of the Tribe (who succeeded former Chairman Brown); and the Declaration of Sarah Garcia ("Garcia Decl."), the Tribe's Secretary-Treasurer. The latter two Declarations are submitted herewith because the attest to relevant documents.

The issues in this case revolve around negotiation of Memorandum of Agreement ("MOA") (Garcia Decl., Ex. 2) on behalf of Claimants and the Tribe, respectively, for the purpose of performing preliminary work on the Tribe's casino project, the authorization by the Tribal General Council of the Tribe's entry into the MOA, and the Tribe's eventual termination of the MOA in breach thereof, resulting in very substantial damage to Claimants. As detailed in the accompanying Declarations of Mr. Brown and Mr. Kerrigan, the Tribal General Council plainly did duly authorize the Tribe's entry into the MOA. The General Counsel first did so by formal resolution at its August 4, 2007 meeting. The Tribe now implausibly suggests, however, that its General Council authorized the Tribe's entry into the MOA only with a third party with whom the Tribe had never dealt (First Nations Capital), or only if a Claimant company changed its name (to First Nations Capital).

The source of this confusion is the simple fact that when negotiations of the MOA began in early 2007, Mr. Kerrigan was transitioning from his former firm (First Nations Capital) to his present firms (PTP and PDPX), which were then in the process of being formed. As a result, a two of Mr. Kerrigan's early e-mails to former Chairman Brown were still formatted to refer at the bottom to First Nations Capital as part of Mr. Kerrigan's standard contact information, a transitional glitch that was soon corrected. *See* Kerrigan Decl., ¶ 5; Brown Decl., ¶¶ 4-5. While

the glitch was apparently carried over to the minutes of the August 4, 2007 General Council meeting, there was never any doubt that that the Tribe at all times undertook to deal with Mr. Kerrigan, acting through companies that he controlled. Thus, all drafts of the MOA -- from November 2006 forward -- referred only to PTP or PDPX, and not to First Nations Capital. See O'Reilly Decl., ¶¶ 2-3; Kerrigan Decl., ¶ 6; Brown Decl., ¶ 4.

Further, at its November 10, 2007 meeting the Tribal General Council passed another resolution authorizing acceptance of a $10,000 payment from PDPX pursuant to the MOA, and the use of that money to hire a gaming consultant to assist with implementation of the MOA. See Brown Decl., ¶¶ 11-13 & Ex. 2 (Items VI & VII), Ex. 3-4; Kerrigan Decl., ¶ 4 n.1 & Ex. 1, ¶ 10 & Ex. 7. The Tribal General Council thereby confirmed its prior authorization on August 4, 2007 for the Tribe's entry into the MOA with those who had conceived, drafted and negotiated it -- Messers. Kerrigan and O'Reilly, acting through companies controlled by them -- PTP and PDPX. The Tribe was well aware that after execution of the MOA on September 4, 2007, PDPX undertook substantial performance of the MOA at considerable expense on behalf of the Tribe. See Kerrigan Decl, ¶ 10 & Ex. 6

The Tribe's termination of the MOA on March 22, 2008 related to a longstanding internal Tribal power struggle that led to then-Chairman Brown's removal from office, but apparently had little to do with the MOA other than the fact that it had been sponsored by then-Chairman Brown. See Brown Decl., ¶¶ 9 & n.1, 14, 16.   In any event, Mr. Kerrigan was never informed by the Tribe of any other reasons for its termination of the MOA, and the MOA required that he be given notice of any purported breach on the part of PDPX and an opportunity for cure. See Garcia Decl., Ex. 2, MOA pp. 5-6, ¶ VI.1. In the process of terminating the MOA, however, the

3

Tribe acknowledged that the MOA had otherwise been entered into by the Tribe. *See* Brown Decl., ¶¶ 14-15.

## SUMMARY OF LEGAL ARGUMENT

### I. The MOA Was Validly Authorized by the Tribal General Council.

As demonstrated above, the Tribal General Council duly authorized the Tribe's entry into the MOA (consenting to arbitration of any disputes arising thereunder) by resolution passed at its August 4, 2007 meeting. The Tribal General Council further effectively consented thereto by accepting a $10,000 payment -- with the approval of its General Council -- pursuant to the MOA. *See* Brown Decl., ¶¶ 11, 13 & Ex. 2; Kerrigan Decl., ¶ 10 & Ex. 7. *See, e.g., Match-E-Be-Nash-She-Wish Band*, 383 F. 3d 512, 518 (6th Cir. 2004) (payment to Indian tribe pursuant to casino development agreement evidenced parties' intent to enter into binding agreement); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F. 2d 469, 473, 480-81 (9th Cir. 1991) ("*Standard Fruit*") (in view of payments between parties pursuant to agreement analogous to MOA, even nonsignatory deemed to have agreed to be bound thereunder).

The Tribe further exploited the MOA by accepting substantial uncompensated services thereunder. *See* Kerrigan Decl., ¶ 10 & Ex. As a result, the General Council acknowledged the Tribe's MOA with Mr. Kerrigan and his company PTP (which has the same ownership and management as PDPX). *See* Brown Decl., ¶¶ 14-15 & Ex. 5-6. *See also Standard Fruit*, 937 F. 2d at 473, 480 (nonsignatory's internal documents referring to binding agreement evidenced its agreement,[1] as to which it and two closely affiliated companies were "treated ... as one entity"). Indeed, the General Council formally approved a contract with a consultant (Kani Neves of

---

[1] *See also Teledyne, Inc. v. Kone Corp.*, 892 F. 2d 1404, 1405 & n.1 (9th Cir. 1990) (similar).

4

Verified Systems) retained to assist with the implementation of its MOA with "Pacific Tribal Partners." *See* Brown Decl., ¶¶ 12-13 & Ex. 2 (items VI & VII), Ex. 3-4; Kerrigan Decl., ¶ 4 n.1 & Ex. 1. The Tribe "may not make use of a contract ... and then attempt to avoid the duty." *Boucher v. Alliance Title Co., Inc.*, 127 Cal. App. 4th 262, 272 (2005).

## II.   The Tribe Has Waived Its Sovereign Immunity for Purposes of the MOA.

Recent decisions by the U.S. Supreme Court make clear as a matter of law that the Tribe has waived its sovereign immunity for purposes of this proceeding. As recognized in the District Court opinion that compelled arbitration in this proceeding, and as explained below, the Tribe's waiver of sovereign immunity does *not* depend on resolution of the Tribe's contention that the MOA is void for lack of requisite regulator approval (an argument addressed in part III below).

First, the U. S. Supreme Court has squarely held that "as a matter of substantive federal arbitration law, an arbitration provision is *severable* from the remainder of the contract," such that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445, 449 (2006) (emphasis added). *See also Preston v. Ferrer*, 128 S. Ct. 978 (2008) (applying *Buckeye* to claim that contract was void under regulatory statute). Second, the Supreme Court has likewise held that an arbitration clause in a contract entered into by an Indian tribe is itself a <u>waiver of the tribe's sovereign immunity</u>. See *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418-19 (2001) (waiver of sovereign immunity where, as here, the arbitration clause provided for judicial enforcement and was governed by American Arbitration Association ["AAA"] rules to similar effect)

As noted in the District Court Order compelling arbitration of this proceeding (p. 5, lines 16-23), there are also a number of other express waivers of the Tribe's sovereign immunity throughout the MOA (although Claimants need only rely on the arbitration itself in view of the Supreme Court decisions presented above). Further, Claimants contend in part IV.A below that the Tribe further waived its sovereign immunity in this proceeding by incorporating certain provisions in the Tribe's Compact with the State of California relating to gaming matters.

### III. The Tribe's Disingenuous Defense Based on IGRA Should Be Rejected.

Despite having terminated the MOA (in breach thereof) in March 2008, the Tribe by letter of June 26, 2008 (Ex. 1 hereto) sought an informal opinion from National Indian Gaming Commission ("NIGC"), pursuant to NGIC Bulletin 93-3 (available at www.nigc.gov), that approval of the MOA by the NIGC was required under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.* The Tribe did so, upon the advice of its counsel, on an *ex parte* basis (Claimants were not informed until more than seven months later, when the Tribe's counsel sought to delay this arbitration pending a response from the NIGC) -- and without ever informing the NIGC that the Tribe had in fact *terminated* the MOA. To the contrary, the Tribe represented to the NIGC that "[s]hould the NIGC determine that the MOA <u>does</u> constitute a management contract, the Tribe will submit the MOA under 25 C.F.R Part 533, as required by Bulletin No. 93-3, promptly upon receipt of notification from the NGIC to formally submit the contract for approval." Ex. 1 hereto, pp. 2-3 (emphasis in original).

The acting general counsel of the NIGC advised the Tribe by letter of March 30, 2009 (Johnson Decl., Ex. 1, p. 2) that in her opinion, the MOA "establishes a management relationship" between Claimants and the Tribal casino contemplated by the MOA, in that it "sets

the compensation Pacific will receive, and specifies the term that Pacific will operate the gaming facility." The acting general counsel accordingly opined that the MOA "constitutes a management agreement requiring the approval of the NIGC Chairman" (*id.*, p. 3) under IGRA and NIGC regulations (25 U.S.C. § 2711; 25 C.F.R. § 502.15) (see *id.*, p. 2), having earlier stated that "[m]angement contracts not approved by the Chairman are void" under the regulations (25 C.F.R. § 533.7). *Id.*

This advisory opinion by counsel to the NIGC is in no sense binding on the Arbitrator or deserving of any special deference.[2] Claimants maintain that the advisory opinion is misdirected and should not be accorded any weight. It focuses on two basic economic elements -- compensation and term -- of a management contract that (along with a development agreement) otherwise remained to be negotiated. *See, e.g.*, Garcia Decl., Ex. 2 thereto, p. 2, MOA ¶ I.1, p. 4, MOA ¶ III.1 (the parties shall negotiate exclusively with each other from the effective date of this MOA (the 'Term' [of 180 days]) to complete and execute the Development Agreement and the Management Agreement," although "the economic terms set forth in this Agreement shall not be changed"), p. 5, MOA ¶ IV.1 (Claimants to pay Tribe's costs "*if* the Development and Management agreements are executed") (emphasis added). Under NIGC Bulletin No. 94-5, the MOA is more accurately characterized as a consulting contract rather than a management contract because it "identifies finite tasks or assignments to be performed, specifies the dates by

---

[2] *See, e.g., NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F Supp. 2d 1061, 1065 (N.D. Cal. 2005) ("the advisory opinion of NIGC's General Counsel that the lease provisions violate IGRA has no legal effect because it is not a final decision of the agency"); *Cheyenne-Arapaho gaming Comm'n v. NIGC*, 214 F. Supp. 2d 1155, 1167-68 (N.D. Okla. 2002) (similar) ("The General Counsel is simply a staff member of the NIGC advising the decision-makers and tribal entities when required"); *United States ex rel. St. Regis Mohawk tribe v. President R.C.-St. Regis Management Co.*, 451 F. 3d 44, 49 n.4 (2d Cir. 2006) (similar); *Catskill Development, LLC v. Park Place Entertainment Corp.*, 547 F.3d 115, 127 (2d Cir. 2008) (Sotomayor, J) (similar) (letter from NIGC deputy general counsel Penny J. Coleman "lacks persuasive power").

7

which such tasks are to be completed, and provides for compensation based on an hourly or daily rate or a fixed fee."

Claimants could hardly be expected to commit themselves even to the substantial undertakings contemplated by the MOA (apart from those contemplated under any follow-on agreements) without agreement on the most basic economic terms of the overall project. Importantly, the MOA expressly contemplated and required submission of any management agreement (if and when executed) to the NIGC for approval. *See id.*, p. 1. ("the Company shall assist the Tribe in working with the [NIGC] ... to obtain the necessary approvals to ... manage ... the ... casino...."), p. 9, ¶ VII.1 ("the Tribe will take all requisite ... actions to confirm their authority to enter into this MOA") ("[b]oth Parties agree that this MOA, the development agreement and the management agreement ... shall be ... in conformity with all applicable, federal, state, and tribal laws and regulations"), p. 10, ¶ VII.11 ([t]o the extent required by law, this MOA shall be submitted to the United States Department of Interior for ... approval").

Notably, having sought and obtained the nonbinding opinion by NIGC counsel that the MOA nevertheless does require NIGC approval, the Tribe has not sought such approval -- despite its representation in its June 26, 2008 letter to the NIGC (Ex. 1 hereto, pp. 2-3) that it would do so. The apparent reason for the Tribe's failure to do so is that (1) the MOA provisions viewed by NIGC counsel as "management" provisions are in full accord with express provisions of IGRA, and thus would doubtless be approved by the NIGC itself,[3] and (2) the Tribe's real

---

[3] While the IGRA expressly permits management fees of up to 30% of net tribal gaming revenues, or even up to 40% if justified, and permits management contract terms of up to five years, or even up to seven years if justified, *see* 25 U.S.C. § 2711(b)(5),(c); 25 C.F.R §531.1(h),(i), the MOA limits any such fee in any management agreement contemplated thereunder to 25% of any net gaming revenues, and limits the term of any such management contract to five years. Further, because the MOA contemplated Class III gaming as defined under IGRA (*see* 25 U.S.C. §2703 (6), (7), (8)), the requirements for approval of management companies under any management agreement

purpose in seeking the opinion of NIGC counsel was not at all to comply with IGRA, but rather was only its improper purpose (withheld from the NIGC) of seeking to create an artificial and unfair defense to its termination of the MOA. This "defense" -- that the MOA is supposedly void *in toto* absent NIGC approval of its relatively few provisions deemed by NIGC counsel to be "management" provisions -- depends upon the Tribe's refusal to submit the MOA to the NIGC for approval.[4] Otherwise, the NIGC would doubtless approve those MOA provisions under express provisions of IGRA (as demonstrated above), and the NIGC approval would be given retroactive effect.. See *United States ex rel. Seymour Buxbom, v. Naegele Outdoor advertising Co. of California, Inc.*, 739 F. 2d 473, (9th Cir. 1984) (Bureau of Indian Affairs "has the power to approve the agreement retroactively and ... the approval precludes a judgment in this case that the agreement ... is void").

Such defense, if permitted in the circumstances presented here (it cannot be, for all the reasons discussed below), would permit any Indian tribe to commit wholesale fraud by accepting substantial payments under gaming-related agreements, and inducing very substantial expenditures and efforts by counter-parties relying upon such agreements, and then simply walking away from its agreements without any responsibility for the harm imposed by its false and/or broken promises. Moreover, to the extent such defense were permitted, it would inevitably inhibit the growth of tribal gaming and development (by undermining the trust and security of potential investors), contrary to the very aims of IGRA. See *Calvello v. Yankton Sioux Tribe*, 899 F. Supp. 431 (D.S.D. 1995) (such inequitable results "may well increase the

---

resulting from the MOA are substantially reduced (in deference to the primary role of states in this regard, as discussed in part IV.A, *infra*). See 25 U.S.C § 2710(d)(9); 25 C.F.R. §§ 533.3(d)(1), 533.6, 537.1.

[4] Claimants could not themselves submit the MOA to the NIGC for approval absent the cooperation of the Tribe. *See* 25 C.F.R. § 53.3(b), (e)(1).

cost and diminish the availability of qualified contractors to perform services desired by the Tribe")

A number of Courts have rejected such defense, holding that under common law (including California law that is controlling here) (*see* part IV below), Indian tribes must at least reimburse their counter-parties even if their gaming-related agreements are deemed void under IGRA absent submission of the agreements to the NIGC for approval. For example, in *Rita, Inc. v. Flandreau Santee Sioux Tribe*, 798 F. Supp. 586 (D.S.D. 1992), a tribe terminated a Class III gaming management agreement, following a change in tribal government, for lack of regulatory approval -- rendering the agreement void by statute -- despite the tribe's refusal to seek such approval (which the agency said it would likely grant), in breach of the Tribe's express obligation under the agreement to do so. The Court declared that the management company, which stood to forfeit a substantial investment in the project, "clearly has some rights in the operation and its assets which the defendants [the tribe and its council] cannot simply appropriate for their own use regardless of the enforceability of the agreement." *Id.* at 589.

Similarly, in *Gallegos v. San Juan Pueblo Business Development Board, Inc.*, 955 F. Supp. 1348 (D.N.M. 1997), a tribe cancelled a three-year-old lease of slot machines on grounds that it amounted to a management contract never approved by the NIGC, and hence was void -- relying on an advisory opinion issued shortly thereafter by the same Penny Coleman (then associate general counsel to the NIGC) who issued the advisory opinion to the Tribe (Johnson Decl., Ex. 1).[5] On that basis, the tribe laid claim to the lessor/manager's machines. The Court nevertheless remanded the latter's replevin claim to state court, finding that such state court

---

[5] *See also Catskill Development, LLC v. Park Place Entertainment Corp.*, 547 F.3d 115, 127 (2d Cir. 2008) (Sotomayor, J) (letter from Penny J. Coleman, then deputy general counsel to the NIGC, "lacks persuasive power").

action could not interfere with federal regulation whether the action involved cancellation of a lease or a void management contract.. *Id.* at 1350.[6]

Alternatively, the Tribe's IGRA defense should be rejected precisely because the Tribe has failed to submit the MOA to the NIGC for approval. This was the approach taken in *United States ex rel. St. Regis Mohawk Tribe v. President R.C.—St. Regis Management Co.*, 451 F. 3d 44 (2d Cir. 2006). In that case, an Indian tribe terminated an NIGC-approved management agreement (in order to bring in new management when business at the casino was "not as brisk as expected"). After the aggrieved management company brought suit in state court for breach of contract, the tribe brought a federal action seeking to recover from the management company some $14 million that the Tribe had paid for construction of the casino, asserting that the construction contract (to which the management company was a party pursuant to its management contract) was itself a "management" contract void under IGRA for lack of NIGC approval -- notwithstanding that the construction contract had never been submitted to the NIGC for approval.

The Court of Appeals held that under IGRA, the NIGC has exclusive jurisdiction to determine in the first instance whether a contract is void under its regulations.

---

[6] *See also Tri-Millenium Corp. v. Jena Band of Choctaw Indians*, 725 So. 2d 533, 537-38 (La. App. 1999) (following *Rita* and refusing to dismiss state law claims for restitution and conversion despite letter from NIGC asserting that development agreement cancelled by tribe required NIGC approval and was otherwise void) ("Indians could not induce the plaintiff into investing in the project and accept money, without allowing the plaintiff a recourse for asserting its grievances"). *Sungold Gaming (USA) Inc. v. United nation of Chippewa, Ottawa, and Pottawatomi Indians of Michigan, Inc.*, 1999 WL 33237035, at *4 (W.D. Mich. 1999) (similar) (remanding state law claims after concluding that memorandum of understanding cancelled by tribe was not a management contract, but rather "an agreement to create a management contract under IGRA" and thus was "precursory to the creation of a management contract"); *American Vantage Cos. v. Table Mountain Rancheria*, 103 Cal. App. 4th 590, 596-97 (2003) (applying *Gallegos* rationale to uphold state law claims for tribe's termination of consulting agreement following ouster of tribal chairman in recall election); *Rumsey Indian Rancheria of Wintun Indians of California v. Dickstein*, 2008 WL 648451 (E.D. Cal. 2008) (applying *Gallegos* rationale in remanding to state court state law claim for unjust enrichment against tribe for terminating contract, despite tribe's contention that contract was management agreement void for lack of NIGC approval).

11

> If the Tribe is correct in its contention that the Construction Contract required approval pursuant to IGRA, then the administrative remedy available to the Tribe would be submission of the Construction Contract [to the NIGC] for approval pursuant to 25 U.S.C. § 2711(b). ... Similarly, if the Tribe wished to void the Construction Contract on the ground that it was a contract not submitted for approval as required by IGRA, ... then the Tribe could request a hearing before the Chairman [of the NIGC] on the matter pursuant to § 2711(f). ...[T]he Tribe impermissibly sought a determination outside the administrative review scheme crafted by Congress.
>
> \* \* \* \*
>
> ... As it is, this Court, like the district court below, is without jurisdiction to order any form of relief because the Tribe failed to comply with the mandatory, statutorily prescribed remedies that must be exhausted before proceeding to the federal courts.

451 F. 3d at 50-51 (footnotes omitted).

By the same token, the Arbitrator should not even entertain the Tribe's purported IGRA defense in this proceeding because the Tribe failed either to submit the MOA to the NIGC for approval or to pursue a hearing before the NIGC Chairman (as opposed to an advisory opinion from the NIGC's acting general counsel) to determine both whether the MOA required approval *and* whether it should be approved under IGRA. The Tribe would not likely have prevailed at any such hearing, particularly on the latter issue, for the reasons presented above.

Further, even if the Arbitrator were to determine that he nevertheless possesses (and ought to exercise) jurisdiction to determine such issues himself, without the benefit of a considered and definitive determination by the agency vested by Congress with authority and expertise in this regard, the Arbitrator should then resolve *both* whether the MOA requires approval *and* whether it *merits* approval under IGRA and NIGC regulations. In other words, even if the Arbitrator were to step into the shoes of the NIGC Chairman and determine that the MOA requires approval under IGRA, the Arbitrator should not in fairness stop there, as the

Tribe would have it. Rather, the Arbitrator should then proceed to determine that any "management" provisions of the MOA are in accord with NIGC regulations, such that for purposes of this proceeding at least, the MOA is *not* void under IGRA or NIGC regulations, either in whole or in part.

### IV.   Claimants Are in Any Event Entitled to Recover Under State Law.

#### A.   Even Under IGRA, the MOA Is Governed by California Law.

The Tribe has agreed that California law governs application and construction of the MOA. *See* Garcia Decl., Ex. 2, p. 9, ¶ VII.3. Moreover, because the MOA contemplated "Class III gaming,"[7] IGRA itself dictates that the MOA is governed by California law. Class III gaming is regulated primarily by Compacts negotiated between tribes and states rather than by administration of IGRA by the NIGC. *Compare* 25 U.S.C. §2710(a)-(c), § 2711 (Class II gaming) *with* § 2710(d) (Class III gaming). Respondent Tribe entered into a Tribal-State Compact with the State of California (Exhibit 2 hereto) by October 8, 1999, duly approved by the federal Department of the Interior on May 5, 2000.

As explained in *Artichoke Joe's California Grand Casino v. Norton*, 353 F. 3d 712 (9th Cir. 2003), "IGRA is an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Id.* at 715 (quoting court below). IGRA "introduced the compacting process as a means of sharing with the states the federal government's regulatory authority." *Id.* at 722. Under IGRA, "all state laws pertaining to the

---

[7] Under IGRA, 25 U.S.C. § 2703(6),(7),&(8), "Class I gaming" is defined essentially as social games for prizes of minimal value, and "Class II gaming" includes bingo and certain card games, while "Class III gaming" is defined as all other forms of gambling, typically of the type found in casinos.

licensing, regulation, or prohibition of [Class III] gambling ... shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the state," except that duly approved Tribal-State compacts may supersede such state law. 18 U.S.C. § 1166(a), (c).[8]

Among the provisions of Respondent's Tribal-State Compact, the Compact provides that: "Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, *except* for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency." Ex. 2 hereto, p. 15, Sec. 6.4.5. *See id.*, Sec 6.4.6 (same regarding any agreement between the Tribe and any "Financial Source"). *See also id.*, p. 4, Sec. 2.11-2.12 ("Gaming Resource Supplier" includes provider of "Class III gaming consulting services").

Thus, the Tribe's Compact with the State provides that even if the Tribe terminates its contract with a "Class III gaming consultant" because the consultant has not been approved by the State Gaming Agency (which supplants the NIGC for Class II gaming), the consultant is still entitled to recover all sums that the consultant is owed at the date of termination. Moreover, this provision could not be rendered void for lack of approval of the MOA by the NIGC because this provision -- adopted by the Tribe and State respecting Class III gaming -- does not require any approval of the NIGC. In addition, while the provision apparently sets a baseline, it does not preclude the Tribe from granting greater rights in the MOA (*e.g.*, respecting payment of interest).

---

[8] *See also* 25 C.F.R. § 501.2(d) ("Nothing in [IGRA] or this chapter shall impair the right of an Indian Tribe to regulate Class III gaming on its Indian lands concurrently with a State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by a Tribal-State compact that is entered into....")

14

Further, the provision appears to constitute an independent waiver of the Tribe's sovereign immunity.

### B. Any "Management" Provisions of the MOA Are Severable.

Even if any "management" provisions were found to be void for lack of NIGC approval, they would severable under controlling California law, even apart from the fact that the Tribe expressly agreed that the provisions of the MOA are severable.[9] In *Marathon Entertainment, Inc. v. Blasi*, 42 Cal. 4th 974 (2008), the circumstances were analogous to those presented here. That case involved a regulatory statute, the California Talent Agencies Act, that -- similar to IGRA -- regulated "agent" agreements with performers, but not closely related "management" agreements with performers, and provided that contracts involving unlicensed "agent" agreements were void. The case presented a situation where pursuant to a "management" contract, a company was alleged to have provided unlicensed "agency" services as well as unregulated "management" services. As a result, the client sought to void the entire contract in order to avoid payment even for the lawful "management" services. The California Supreme Court held that this would be an inequitable and unnecessary result in many circumstances, particularly in light of California Civil Code § 1599, which calls for severance where feasible.

### C. Even if the MOA Were Deemed Void (Except For Its Arbitration Clause), Claimants Would Plainly Be Entitled to Recover.

Even if a contract is wholly void, such that its particular terms cannot be enforced, it is nevertheless fundamental longstanding "quantum meruit" law in California as elsewhere a party who performed services for the benefit of another, and at the latter's request, is entitled to

---

[9] *See* Garcia Decl., Ex. 2, p. 9, ¶ VII.7 ("The provisions of this MOA are independent of and separable from each other, and no provisions shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in [p]art[]").

15

recover the reasonable value of the services in order to avoid an inequitable result. *See, e.g.*, 55 Cal. Jur. 3d, Restitution §§ 48-49, 64; *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 & n. 6 (2004); *Mannix v. R.L. Radke Co.*, 136 P. 52 (1913); *Boyd v. Bargagliotti*, 107 P. 150 (1909).

## CONCLUSION

Claimants are entitled to a reasonable and just recovery. The Tribe's defenses to the contrary are without merit.

Respectfully submitted,

*David McCullough*
Doerner, Saunders, Daniel & Anderson
201 Robert S. Kerr Avenue, Suite 700
Oklahoma City, OK 73102-4203
Telephone:  405-319-3501
Facsimile:   405-319-3531
E-mail: dmccullough@dsda.com

Counsel for Claimants

Of Counsel:

Timothy W. Bergin
Hall, Estill, Hardwick, Gable, Golden
    & Nelson, P.C.
Washington, D.C. 20036-3406
Telephone:  202-973-1224
Facsimile:   202-973-1212
E-mail: tbergin@hallestill.com

Dated: August 19, 2009

77456.1:520658:00540