IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELEM INDIAN COLONY OF POMO INDIANS,<br><br>             Plaintiff,<br><br>     v.<br><br>PACIFIC DEVELOPMENT PARTNERS X, LLC, et al.,<br><br>             Defendants.<br>                                                              / | No. C 09-1044 CRB<br><br>**ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION** |

Defendants ask this Court to grant them leave to file a motion for reconsideration. Defendants rely on the grounds outlined in Local Rule 7-9(b)(2), which provides that such a motion for leave may be granted upon a showing of "[t]he emergence of new material facts or a change of law . . . ." Defendants argue that the Supreme Court's opinion of April 27, 2010, in Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S.Ct. 1758 (2010), dictates that the arbitrator's decision be reversed.

Stolt-Nielsen dealt primarily with the issue of class arbitration where not all parties have agreed to participate in class arbitration. The Court noted that the parties agreed that the relevant contract was "silent on whether [it] permit[ted] or preclude[d] class arbitration." Id. at 1770 (alteration in original). The Court went on to conclude that "[t]his stipulation left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task." Id. Defendants rely on this language to

1  resurrect their argument regarding the stipulation entered into in this case.  Defendants
2  remind this Court that the parties agreed that the memorandum of understanding ("MOA")
3  approved by the Tribe's executive committee on September 3, 2007, was essentially the same
4  as the MOA that was executed on the following day.  This stipulation, according to
5  Defendants, forbade the arbitrator from concluding that there were, in fact material
6  differences between the September 3 and September 4 versions of the MOA.

7  However, as noted in this Court's prior order, this issue need not be reached because
8  the arbitrator's decision also rested upon an <u>independent</u> rationale: that the MOA was void
9  for lack of regulatory approval.  Defendants now argue that this independent rationale was
10 not in fact independent, and that the arbitrator's factual error equally pollutes both holdings.
11 For the reasons that follow, this argument is not persuasive.

## Analysis

13 Defendants argue that the arbitrator's failure to accept the parties' stipulation was an
14 essential component of his conclusion that the MOA was void for regulatory approval, and
15 that his error therefore could not be harmless.  Defendants direct our attention to the Supreme
16 Court's admonition in O'Neal v. McAninch, 513 U.S. 432, 438 (1995): "The inquiry cannot
17 be merely whether there was enough to support the result, apart from the phase affected by
18 the error.  It is rather, even so, whether the error had substantial influence.  If so, *or if one is*
19 *left in grave doubt*, the [decision under review] cannot stand."

20 First, O'Neal was a habeas case and had nothing whatsoever to do with arbitration.
21 Second, even accepting the standard proposed by Defendants, the arbitrator's decision must
22 stand, for the alleged error did not have "substantial influence" on the independent holding,
23 and this court is not left "in grave doubt."

24 Given the deferential standard afforded to the decisions of arbitrators, this Court
25 cannot conclude that the disregarded factual stipulation had any substantive impact
26 whatsoever on the arbitrator's decision regarding the lack of regulatory approval.  The sole
27 error identified by Defendants concerns the arbitrator's understanding of when various drafts
28 of the MOA were provided to certain members of the Tribe.  Defendants do not dispute that a

2

variety of drafts of the MOA were in fact produced, and that the final draft was substantially different from the earlier drafts. In particular, Defendants do not appear to dispute that "Version 3" of the MOA, which was discussed extensively in the arbitrator's opinion and is in this Court's record at Docket No. 42-2, does in fact differ substantially from the final draft. The arbitrator was apparently under the impression that only an early version of the MOA had been presented to the Tribe on September 2, but the parties had stipulated that this was not the case.

The issue of when Version 3 of the MOA, as opposed to the final version, was presented to the tribe, is irrelevant to the issue of whether the final version needed regulatory approval. The arbitrator explained in his order that to rely on a contract with an Indian Tribe with regard to gaming requires, in addition to compliance with the Tribe's Constitution, "approval by the [National Indian Gaming Council] if the contract falls within their guidelines." Dkt. 42-1, at 6. The arbitrator went on a few pages later to discuss a list of changes made between Version 3 and the final version, and concluded that "[t]he signed draft . . . of September 4, 2007 and the document entitled Version 3 (unsigned) are not the same. They are dramatically different, not just in verbage [sic], but in obligations imposed and remedies or benefits received." Id. at 9. The arbitrator then explained that these substantive changes, and the question of when and if they are disclosed to the Tribe, reveal "the reasons for the creation of the National Indian Gaming Commission and IGRA. Whether one agrees with the philosophy or positions of these entities or not, they represent the controlling law dealing with recognized Indian Tribes on Indian lands when dealing with gaming issues." Id.

These prefatory references to the National Indian Gaming Council, and the fact that some contracts require its approval, lead to the arbitrator's discussion at the end of his order:

> In the Arbitrator's opinion, the MOA of September 4, 2007, because of the extensive changes and substantial alterations to the Version 3 MOA it should have received NIGC approval before it became operative . . . . The signed MOA of September 4, 2009, is invalid and unenforceable according to the Constitution of the Respondents and to the rules and regulations of the National Indian Gaming Commission.

3

Id. at 10 (emphasis added). As reflected here, the arbitrator relied on the series of changes implemented between Version 3 and the final version to conclude that the final version "should have received NIGC approval before it became operative." While Defendants dispute the issue of when Version 3 was edited, and when it was presented to the Tribe, they do not dispute that the document entitled "Version 3" and submitted as an exhibit to this Court is, in fact, different from the final version.

Defendants' primary textual argument relies on the following passage: "If the contrary is true, i.e. Exhibits 10 and 15 were in front of the [Executive Committee] on September 3, 2007 then the Claimants would be correct in asserting the import of Stipulation No. 44 and Respondent/Tribe's argument would/should be dismissed." Id. at 8. Defendants suggest that this amounts to the arbitrator admitting that, if in fact the final version of the MOA was in front of the Executive Committee on September 3—which the parties stipulated to—the Tribe's case must be dismissed. However, this is not a reasonable interpretation of the passage. First, the arbitrator wrote only that, the "argument" should be dismissed, not the entire case. Given that prior pages focused on a different argument—"[w]hether or not the General Council or its authorized agents approved the 'final Draft' . . . according to the mandates of the Tribe's Constitution and By Laws"—it is unreasonable to conclude that the arbitrator believed that the stipulated fact would have undermined his conclusion on the issue of regulatory approval. Indeed, it is hard to see how the timing of the various versions could possibly impact whether the final version required regulatory approval. The issue of regulatory approval concerns the nature of the contract and whether it is the type of contract that falls withing NIGC's purview. This analysis is in no way affected by the issue of whether and when the contract was disclosed to the Tribe.

Defendants also note that the arbitrator's preliminary conclusions indicated that he rejected the regulatory approval argument, and suggest this undermines his later conclusion to the contrary. But of course this is the virtue of a preliminary conclusion: it can be changed. The language in the arbitrator's final order is unambiguous: "[T]he MOA of September 4, 2007, because of the extensive changes and substantial alterations to the

4

1  Version 3 MOA it should have received NIGC approval before it became operative . . . ." Id.
2  at 10. It is unavailing to now argue that, before he accepted the argument in a final order, the
3  arbitrator had preliminarily rejected it.

4  Next, Defendants once again dispute the award of attorney's fees. Defendants suggest
5  that this Court's order "overlooks controlling law," and relies instead on a now-overruled
6  Eleventh Circuit case, Lifecare Int'l, Inc. v. CD Medical, Inc., 68 F.3d 429, 436 (11th Cir.
7  1995). Defendants in fact refer to Lifecare as the "linchpin" of this Court's prior order,
8  despite the fact that the case is cited once, and only in a footnote. Moreover, Lifecare was
9  cited as authority for a proposition that has been by no means overruled. As the Ninth
10 Circuit recently stated, an arbitral award may be vacated only if it is "'completely irrational'
11 or 'constitutes manifest disregard of the law.'" Comedy Club, Inc. v. Improv West Assoc.,
12 553 F.3d 1277, 1288 (9th Cir. 2009). Despite the fact that the arbitrator did not cite the
13 proper legal authority for his award of attorney's fees, his award was neither "completely
14 irrational" or in "manifest disregard of the law."

15 As for this Court's failure to rely on controlling law, Defendants once again fail to cite
16 any persuasive authority. Defendants first argue that state law cannot support an award of
17 fees here because "'the litigated issues involved not basic contractual enforcement
18 question[s] but issues peculiar to . . . federal law.'" Mot. at 12 (quoting Resolution Trust
19 Corp. v. Midwest Federal Savings, 36 F.3d 785, 800 (9th Cir. 1993)). However, this is at
20 heart a contract claim. Defendants initiated this suit for breach of contract, and in fact they
21 dispute that federal law intervenes to preclude their claim. The contract at issue adopts
22 California law, which in turn supports an award of fees here. See Lafarge Conseils Et
23 Etudes, S.A. v. Kaiser Cement & Gypsum Corp, 791 F.2d 1334 (9th Cir. 1986). In fact, the
24 exception cited in Resolution Trust has been overruled by the Supreme Court. Resolution
25 Trust cited In re: Fabian as authority for the exception, and Fabian had confined the
26 exception to issues of federal bankruptcy law. This case was specifically overruled by the
27 Supreme Court. See Travelers Cas. and Sur. Co. of America v. Pac. Gas & Elec. Co., 549
28 U.S. 443, 451-52 (2007). There is no authority for proposition that, despite the contract's

5

adoption California law, the presence of a federal issue precludes an award of attorney's fees under state law.

Defendants also contend that "the Ninth Circuit has held that Cal. Civ. Code § 1717 is preempted by federal law governing labor arbitration agreements." Mot. at 12. While this is true, this case does not concern a labor arbitration agreement. Defendants suggest that such a holding "is logically extended to preemption of § 1717 under the FAA as well." Id. Defendants neglect to note this Court's prior citation to Lafarge, an FAA case that awarded fees under § 1717. If indeed the FAA preempted § 1717, Lafarge could not have been decided as it was.

Finally, Defendants contend that because Plaintiff failed to ask for fees at the outset of arbitration, it waived its opportunity to obtain them. Defendants cite a series of cases, but none supports their position. For example, U.S. ex rel. Leno v. Summit Const. Co, 892 F.2d 788 (9th Cir. 1989), did not concern a pure failure to request attorney's fees. On the contrary, the party in that case failed to establish in the trial court an appropriate basis for jurisdiction. Because the party had only argued for jurisdiction under the Miller Act, which does not permit an award of fees, the Circuit Court affirmed the district court's decision not to award fees. Also, as for Port of Stockton v. Western Bulk Carrier KS, 371 F.3d 1119, 1121-22 (9th Cir. 2004), that case concerned a failure to ask for fees before judgment was entered.

While Defendant is correct that Plaintiff did not ask for an award for attorney's fees in its pleadings, it certainly did request fees once it prevailed. At that point, the arbitrator awarded them. See Dkt. 42-5 at 16. Defendants have not cited any law to support the conclusion that a party to arbitration must submit a request for fees in pleadings or other preliminary paperwork. The contract in conjunction with California law entitled the Tribe to an award of fees, and through its "Request For Modification of Arbitration Award to Include Specific Award of Attorneys' Fees," Plaintiff submitted the issue to the arbitrator. While Defendants are quite right that the arbitrator awarded fees on a flawed theory, and that he specifically rejected the theory this Court relies upon, it remains the fact that the award of

6

fees was not contrary to law. His decision was neither "completely irrational" nor did it constitute "manifest disregard of the law." <u>See</u> <u>Comedy Club</u>, 553 F.3d at 1290. On the contrary, the arbitrator accidentally provided for a lawful result. Defendants once again butt their heads against the standard of review: it is simply not enough to point out mistakes made by the arbitrator.

Because Defendants' arguments were sufficiently addressed in the prior order, and they raise no substantial new arguments, their motion is DENIED.

**IT IS SO ORDERED.**

Dated: June 29, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE